# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| NEFI IBARRA, | Civil No. 12-3027 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF WILLMAR and WILLMAR MUNICIPAL UTILITIES, | |
| Defendants. | |

James H. Kaster and David E. Schlesinger, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Jason J. Kuboshek, **IVERSON REUVERS CONDON**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Plaintiff Nefi Ibarra brings this action against his former employer Willmar Municipal Utilities ("WMU") and the City of Willmar (collectively, "Defendants") alleging that he was terminated because of his national origin – Mexican – and his religion – Mormon – in violation of Title VII of the Civil Rights Act of 1964 and the Minnesota Human Right Act ("MHRA"). Defendants move for summary judgment on all of Ibarra's claims. Because a material issue of fact remains as to whether Ibarra was terminated as a result of illegal discrimination due to his national origin and religion, the Court will deny Defendants' motion.

## BACKGROUND

## I.   HIRING PROCESS FOR COAL HANDLER POSITION

On June 11, 2011, WMU placed an advertisement for a "coal handler/maintenance helper." (Aff. of Jason J. Kuboushek, Ex. A, pt. 2 at 19 Nov. 1, 2013, Docket No. 18.)[1] Under the heading "License" the advertisement listed "State of Minnesota Steam Engineers Special License" and "Minnesota Commercial Class B Drivers License." (*Id.*) The advertisement listed the position duties as "[r]esponsible for unloading and hauling coal," "[r]esponsible for maintenance and repairing of coal handling equipment & vehicles," and "[a]ssist in other maintenance duties as requested." (*Id.*) The position requirements included, among other things, "[m]echanical aptitude, pay loader and welding experience," "[w]illing and able to work from small platforms at 100 ft. heights," and "[p]hysically able to climb into railroad coal cars." (*Id.*)

Four WMU employees were involved in the hiring process for the coal handler position: Kenneth Nash, the supervisor of power production; Odean Iverson, the maintenance foreman for the power plant; Rick Baker, the operations foreman for the

---

[1] The Affidavit of Jason J. Kuboushek was filed at Docket Number 18. Exhibits A, B, and C to that affidavit are also filed at Docket Number 18. Exhibits D through G are filed at Docket Number 19, and Exhibits H through L are filed at Docket Number 20. References in this bench memo will be made to the Kuboushek Affidavit and its accompanying exhibits without separately referencing the docket number at which a particular exhibit is filed. Exhibit A was filed as three separate entries – as attachments 1 through 3 of Docket Number 18. Exhibit A includes the deposition of Nefi Ibarra as well as various exhibits to that deposition. The actual deposition will be referred to as "Ibarra Dep." The exhibits are cited by reference to Exhibit A, the relevant attachment, and the CMECF page number upon which the cited material appears. With the exception of depositions, references to page numbers of the parties' exhibits refer to the CMECF pagination.

power plant; and Bruce Gomm, the general manager.  (Kuboushek Aff., Ex. B (Dep. of Odean Iverson ("Iverson Dep.") 8:14-18, 11:23-12:2, 15:14-17); Kuboushek Aff., Ex. C (Dep. of Rick Baker ("Baker Dep.") 7:22-8:6, 14:7-11); Kuboushek Aff., Ex. D (Dep. of Kenneth Nash ("Nash Dep.") 8:14-25, 15:14-21).)

Multiple written applications were submitted for the coal handler position, including one from Ibarra, who was born in Mexico and identifies as a Mormon. (Kuboushek Aff., Ex. A, pt. 2 at 17-18; Ibarra Dep. 21:6-7, 42:11-18, 72:5-12.)   On Ibarra's application he indicated that he had been "referred by" Amy Gomm, Bruce Gomm's wife, to apply for the position.  (Kuboushek Aff., Ex. A, pt. 2 at 17; Nash Dep. 16:18-17:10; Ibarra Dep. 31:8-17; Iverson Dep. 17:7-8.)  Amy Gomm and Ibarra's wife were friends through a church outreach program, and their children played together. (Ibarra Dep. 31:11-32:19; Kuboushek Aff., Ex. E (Dep. of Michelle Ibarra ("Michelle Dep.") 8:22-9:2, 10:24-11:20).)

Nash, Iverson, and Baker reviewed the applications and chose three candidates to interview.  (Iverson Dep. 16:22-17:2; Baker Dep. 14:20-23; Nash Dep. 17:25-19:9.)  Two of the candidates had both an engineer's special license and a commercial driver's license.  (Nash Dep. 19:11-20:10.)   The third candidate did not have the engineer's special license and had completed only the written portion of the commercial driver's license test.  (*Id.* 20:11-19.)  Ibarra was not initially chosen to be interviewed because he had neither of the required licenses and had been fired from his previous job.  (*Id.* 20:20-21:1; Iverson Dep. 16:8-11; Baker Dep. 14:16-24.)  Gomm, however, determined that

Ibarra would be given an interview.  (Nash Dep. 18:16-22, 21:3-4; Iverson Dep. 16:18-21; Baker Dep. 14:16-15:2.)

## A.     Ibarra's Interview

In July 2011 Nash, Iverson, Baker, and Gomm interviewed Ibarra.  (Kuboushek Aff., Ex. A, pt. 2 at 20; Nash Dep. 15:10-16:1; Ibarra Dep. 54:11-18.)   During the interview Nash went through a questionnaire with Ibarra which included questions about Ibarra's qualifications.  (Kuboushek Aff., Ex. A, pt. 2 at 20-24.)  Nash also explained the job requirements and duties of the coal handler position.   (Ibarra Dep. 56:7-13; Kuboushek Aff., Ex. A, pt. 2 at 20-21.)  The job requirements listed on the questionnaire were: commercial driver's license, high school diploma or equivalent, "[a]ble and willing to work 12 hour shifts," "[a]gile enough to climb in and out of coal cars," "[a]ble and willing to climb to and work at 100 foot elevations on a platform to perform maintenance on Coal Elevators," "[a]ble and willing to work in confined spaces," passing an employment physical, and participation in a random drug and alcohol testing program. (Kuboushek Aff., Ex. A, pt. 2 at 20.)  Nash explained that Ibarra would be required to obtain a commercial driver's license.  (*Id.*, Ex. A, pt. 2 at 21; Ibarra Dep. 56:16-17.) Nash told Ibarra that he could obtain this license during the first six months of working at WMU.  (Ibarra Dep. 56:16-19.)  The questionnaire also indicates that Nash told Ibarra that "[a]s a coal handler you will be asked to obtain a Special Engineers license and to obtain the next license as you gain time in grade."  (Kuboushek Aff., Ex. A, pt. 2 at 21; Ibarra Dep. 61:7-9, 61:24-62:6.)  Ibarra testified that Nash told him that if he wanted to

become a boiler operator then he would need to obtain the special engineer's license. (Ibarra Dep. 56:20-57:5.)[2]

Nash also explained the position's compensation and benefits to Ibarra. (Kuboushek Aff., Ex. A, pt. 2 at 22-24; Ibarra Dep. 57:12-20.)  Ibarra understood that he would be able to accumulate paid days off.  (Ibarra Dep. 57:16-20; Kuboushek Aff., Ex. A, pt. 2 at 22.)  Additionally, Nash explained that if Ibarra accepted the position he would be placed on a six-month probationary period.  (Ibarra Dep. 60:18-61:2.)  The questionnaire explained the probationary period as meaning

> that for the first six months you will receive all of the benefits and privileges of a regular employee with the exception of Union protection. You **CAN** be dismissed for reasons like attitude, job performance, tardiness, etc. on the very first offense.  If this should happen, you would have no protection under the Union[']s grievance procedure.

(Kuboushek Aff., Ex. A, pt. 2 at 20 (emphasis in original).)

### B.     Hiring Decision

After interviewing Ibarra and the three other candidates, Nash, Iverson, and Baker discussed the hiring decision.  (Nash Dep. 23:22-24:5.)  None of the men wanted to hire Ibarra, because they thought the two applicants with both the required licenses were better candidates.    (Iverson Dep. 12:10-16; Baker Dep. 15:15-16:20; Nash Dep. 21:16:22.)  Nash then spoke with Gomm, who expressed a strong opinion that Ibarra be hired.  (Nash Dep. 22:18-23:5.)  Nash told Gomm he would never be on board with

---

[2] The parties clarified at oral argument that the special engineer's license is the same as the boiler's license referred to in the record.

hiring Ibarra and that he would only do so at the direction of Gomm.  (*Id.* 25:4-6.)

Gomm responded by telling Nash to hire Ibarra, which Nash did.  (*Id.* 25:8-13.)  Gomm

told Nash that he wanted to hire Ibarra because "he was receiving pressure to hire

minorities" and "[h]e felt that [Ibarra] was a good candidate."  (*Id.* 26:8-12; *see also* Aff.

of Sofia B. Andersson-Stern, Ex. 1 at 6, Nov. 22, 2013, Docket No. 24.)  Nash testified

that his frustration with Gomm's practice of hiring unqualified people, specifically with

respect to Ibarra, caused him to retire.  (Nash Dep. 73:2-8, 76:24-77:15; Kuboushek Aff.,

Ex. G (Dep. of Teresita Stoffel ("Stoffel Dep.") 27:18-28:20).)

## II.    IBARRA'S EMPLOYMENT

Ibarra began working as a coal handler on July 11, 2011.  (Ibarra Dep. 84:19-22.)

Ibarra completed paperwork with human resources shortly after beginning his

employment.  (*Id.* 65:8-10.)  Ibarra provided Teresita Stoffel, a WMU human resources

professional, with his permanent resident card, his driver's license, and his social security

card as forms of identification.  (*Id.* 66:21-67:2; Stoffel Dep. 8:20-23.)  Stoffel asked

Ibarra why his permanent resident card and driver's license had two last names (Ibarra

Lopez) while his social security card listed just one (Ibarra).  (Ibarra Dep. 68:4-6; *see*

Kuboushek Aff., Ex. A, pt. 2 at 25-26; Stoffel Dep. 21:7-19.)  Ibarra explained to Stoffel

that his social security card listed only Ibarra because he had "dropped" one of his

parents' last names.  (Stoffel Dep. 21:13-19.)  Stoffel testified that although she was not

concerned that Ibarra's documents were invalid, she did bring the issue to Gomm's

attention because it was the first time she had ever seen an employee's documents where

the names did not match and "didn't know you could have two different identities." (*Id.* 21:22-15.) Ibarra testified that Stoffel asked Gomm "to verify the [social security] card and asked if it was even real." (Ibarra Dep. 68:14-24.) Gomm responded "It looks real to me." (*Id.* 68:25-69:1.) Gomm explained to Stoffel that the difference in last names was common for individuals of Hispanic descent. (*Id.* 70:11-25; Stoffel Dep. 22:21-25.) Ibarra testified that Stoffel asked if there was any way for Ibarra to change his social security card to match his other identification. (Ibarra Dep. 71:9-16.) Later in the day after completing his paperwork, Nash allegedly questioned Ibarra about whether he would be able to change his social security card and stated that "it was better to have every document that matched." (*Id.* 73:11-24.) Although no one explicitly told Ibarra he was required to change his name in order to keep his job, because of these comments, Ibarra did change his social security card. (*Id.* 153:14-24.)

Also while completing paperwork, Stoffel and Ibarra briefly discussed his family. Stoffel noticed that Ibarra had twin daughters, and encouraged him to start studying for citizenship after noticing that his permanent resident card expired in 2013 or 2014, explaining "You don't want to leave your daughters in the United States if you don't get your thing renewed." (Stoffel Dep. 19:20-20:8.) Stoffel's and Ibarra's testimony differs regarding how the subject of Gomm came up, but either Ibarra mentioned that he and his wife had gotten married in Gomm's church or Stoffel asked how Ibarra knew Gomm. (*Id.* 20:9-20; Ibarra Dep. 72:1-9.) After learning that Ibarra attended Gomm's church, Ibarra testified that Stoffel stated "Oh, so you are Mormon." (Ibarra Dep. 72:5-12.) Ibarra confirmed that he was Mormon. (*Id.* 72:11-12.)

- 7 -

### A.    Incidents of Alleged Disparate Treatment

Ibarra's allegations of discrimination stem, in part, from several instances of disparate treatment that he allegedly received during his employment as a coal handler.

### 1.    Paid Days Off

WMU's personnel policies and procedures manual provided that "[d]uring the first six months of employment, PDO use is limited to death in the family and personal or family illness or other emergency." (Kuboushek Aff., Ex. A, pt. 3 at 21.) Ibarra testified that at some point during the first ten weeks of his employment, Nash told him that he could only take PDOs for his "own personal use," and not to care for ill family members. (Ibarra Dep. 108:11-23.)  Nash did, however, allow Ibarra to use a PDO to care for his daughters after they underwent oral surgery. (*Id.* 108:11-17, 109:20-22.)  Ibarra was later informed by Iverson that PDOs could be used for personal or immediate family illness or emergencies. (Kuboushek Aff., Ex. H, pt. 1 at 30-31.)

### 2.    Obtaining Licenses

Ibarra took the written portion of the commercial driver's license exam sometime in October 2011 after he was finished working for the day. (Ibarra Dep. 115:13-17.) Ibarra testified that Nash told him to "hurry up and do the written part" before his work schedule changed. (*Id.* 116:2-6.)  Because the referenced work schedule change would have prevented Ibarra from taking the written test outside of work hours, Ibarra interpreted this to mean that he was required to take the written test outside of work

hours.  (*Id.* 116:2-11.)  When Ibarra later commented about Nash's statement, a coworker said that he did not understand why Ibarra should have to take the test after work hours "when everybody else did it in company time."  (*Id.* 116:15-24.)  With respect to the special engineer's license, Ibarra told Iverson he was planning on obtaining one, but Iverson thought it was "doubtful" that Ibarra would actually do so.  (Kuboushek Aff., Ex. H, pt. 1 at 28.)

### 3.    Pounding Plate Incident

On one occasion Ibarra was using a pounding plate attached to a skid steer. (Ibarra Dep. 156:12-17.)  A pounding plate is used to pound the side of the coal cars in order to loosen up the coal and allow the coal to move down into coal hoppers.  (*Id.* 156:13-21; Andersson-Stern Aff., Ex. 2 at 7.)  Use of the pounding plate saved time and energy, as it prevented coal handlers from entering the cars as often to shovel out coal. (Andersson-Stern Aff., Ex. 2 at 7.)   Nash approached Ibarra while he was using the pounding plate and told him that he should not use the plate for more than five to ten seconds, and that if coal still remained in the car Ibarra needed to go into the car and shovel out the remaining coal.  (*Id.*; Ibarra Dep. 156:23-157:1; *see also* Nash Dep. 68:5-19.)  When Ibarra told his coworkers about Nash's comment they told him that Nash had misinformed Ibarra, and the whole purpose of the pounding plate was to avoid needing to get into the car at all.  (Andersson-Stern Aff., Ex. 2 at 7.)  Additionally, Ibarra testified that he had seen at least one other coworker using the pounding plate attachment for

longer than five to ten seconds.  (Ibarra Dep. 157:13-24.)  WMU later discontinued use of the pounding plate due to noise complaints.  (Iverson Dep. 62:15-63:1.)

### 4.  Silo Incident

On another occasion, Ibarra was directed to enter a silo to clean out a chute that had become blocked with coal.  (Ibarra Dep. 160:12-20.)  Typically, prior to cleaning silos, both ends of the silo are opened to allow airflow, and a monitor is lowered into the silo to check the oxygen and carbon monoxide levels.  (Iverson Dep. 65:1-5; Kuboushek Aff., Ex. H, pt. 1 (Dep. of Jon Folkedahl ("Folkedahl Dep.") 43:1-15); Ibarra Dep. 159:6-9.)  On the day in question, five workers, including Ibarra, went to the silo.  (Ibarra Dep. 161:17-19.)  The silo had not previously been opened and Ibarra was directed to enter the silo with a monitor attached to his body, but allegedly received no instruction on how the monitor operated.  (Andersson-Stern Aff., Ex. 2 at 7; Ibarra Dep. 159:13-161:3.)  The monitor began beeping, but Ibarra continued to descend into the silo, because he was not aware of what the beeping indicated.  (Ibarra Dep. 160:25-161:7.)  After about ten minutes Chris Rosen – the other coal handler – entered the silo.  (Andersson-Stern Aff., Ex. 2 at 7-8; Ibarra Dep. 162:2-8.)  Ibarra showed the activated monitor to Rosen who also did not know what to do about the beeping monitor and communicated with one of the men outside of the silo.  (Ibarra Dep. 162:10-23.)  The oxygen levels were at 55 or 65 percent, and one of the men outside the silo instructed Ibarra and Rosen to come up out of the silo.  (*Id.* 162:16-163:9.)

### 5.   Rumors

Ibarra heard rumors from his wife that people were saying he was an illegal immigrant.  (*Id.* 154:1-8.)  Ibarra told Iverson that he had been hearing these rumors "coming out of the office." (Kuboushek Aff., Ex. H, pt. 1 at 28.)  During a performance evaluation Iverson asked Ibarra if it was true that he was an illegal immigrant, and Ibarra denied it.  (*Id.*)  Ibarra also heard rumors through his wife that he had only gotten his job because he was a Mormon.  (Ibarra Dep. 110:8-111:7, 154:9-14.)

### B.   Ibarra's Performance

Iverson, Ibarra's direct supervisor, testified that initially Ibarra was a good employee.  (Iverson Dep. 17:24-18:2, 59:16-23.)  Iverson told Ibarra that he thought Ibarra was a good coal handler.  (*Id.* 42:21-24.)  Jon Folkedahl, who supervises Iverson, testified that he thought Ibarra "seemed competent and able to do his job." (Folkedahl Dep. 28:8-15.)

Alleged issues with Ibarra's performance began to arise in late 2011, and particularly after December 12, 2011, when Gomm was put on administrative leave from WMU.  (Iverson Dep. 19:1-21.)  Iverson testified that part of the performance issue was that Ibarra had not obtained his special engineer's license.  (*Id.* 18:16-20.)  Ibarra did, however, obtain his commercial driver's license on December 13, 2011.  (Ibarra Dep. 123:25-124:11.)

Chris Rosen, the other coal handler, did not have the special engineer's license. (Iverson Dep. 28:8-10.)  Iverson testified that Rosen was not required to have such a

license because he had originally been hired as a janitor.  (*Id.* 28:11-19.)  WMU foremen testified that the special engineer's license was not required to be a coal handler.  (Baker Dep. 30:20-22; Folkedahl Dep. 27:20-22.)   Nash also testified that the coal handler position itself does not require a special engineer's license, but WMU's preference is that someone in the coal handler position will eventually procure that license in order to advance to working with boilers.  (Nash Dep. 34:4-13.)

Defendants claim that there was also a performance issue related to the number of coal cars that Ibarra unloaded per day.  Ibarra and Rosen often needed help with their unloading work.  (*Id.* 27:11-22, 29:10-15; Iverson Dep. 23:4-23)  Baker testified that Ibarra and Rosen were "slow" and that "they just didn't get enough coal off in a day." (Baker Dep. 19:17-20:1; *see also* Iverson Dep. 23:6-13.)  Ibarra and Rosen unloaded no more than four cars per day.  (Iverson Dep. 23:2-5.)  Iverson testified that a good coal handler could unload five cars per day by himself.  (*Id.* 23:17-24.)  In the months that Ibarra worked at WMU the average number of coal cars unloaded was 2.48, which was actually slightly higher than the average number of cars unloaded both before and after his employment.  (Andersson-Stern Aff., Ex. 3.)  Furthermore, Ibarra testified that Rosen told him he needed to unload between two to three cars per day.  (Ibarra Dep. 92:11-20.)

Rosen complained about Ibarra to Iverson, specifically that Ibarra did not listen to Rosen's instructions, even though Rosen was the senior coal handler.  (Iverson Dep. 72:4-17.)  Additionally, on one occasion Iverson observed Ibarra sitting on a berm while other employees unloaded coal.  (*Id.* 19:23-20:4.)  When Iverson confronted Ibarra about this behavior, Ibarra told Iverson he was just taking a break.  (*Id.* 20:0-24.)   Ibarra

testified that he later told Iverson he had been sitting because he injured his leg, but did not report it at the time because he did not want it to be used as an excuse not to hire him at the end of his probationary period.  (Ibarra Dep. 132:9-22.)

In December 2011 Folkedahl learned that Baker and Iverson had complaints about Ibarra's performance and had raised the possibility of firing Ibarra.  (Folkedahl Dep. 29:4-21, 31:25-32:6.)  Folkedahl asked for specifics about Ibarra's performance, and asked Baker and Iverson to provide him with documentation of the problems.  (*Id.* 29:23-3.)  In a written "Probation Evaluation" Folkedahl indicated that he had:

> Reviewed Nefi's performance w/foremen – negative reports but with few specifics.  Principle complaint is that Nefi and the other coal handler (CR) can't seem to work well together, and one foreman recommended firing Nefi.  Foremen were instructed to document Nefi's performance in writing on a daily basis to provide for their recommendations.  Results: no documentation, no further complaints.

(Kuboushek Aff., Ex. H, pt. 1 at 29.)  With respect to the concerns about slow coal unloading, Folkedahl stated that "[r]eports returned that the reason for slow unloading was poor coal quality (frozen coal condition, large coal size)." (*Id.*)  Folkedahl also noted that "[i]nterviews with other maintenance crew indicate that Nefi does not communicate often or well, but that his actual work performance is equal to CR." (*Id.*)

## III.    IBARRA'S TERMINATION

On December 16, 2011, Ibarra met with Iverson for his year-end review.  (Ibarra Dep. 98:2-22.)  On December 29, 2011, Iverson prepared a written memorandum summarizing the meeting.  (Kuboushek Aff., Ex. H, pt. 1 at 28.)  During the review Iverson emphasized to Ibarra the importance of greasing the elevators, which Ibarra

testified that either he or Rosen had been doing every day.  (Kuboushek Aff., Ex. H, pt.1 at 28; Ibarra Dep. 99:9-100:2.)  Iverson also raised the incident of Ibarra sitting on the berm, at which point Ibarra informed Iverson that he had injured his leg.  (Kuboushek Aff., Ex. H, pt.1 at 28; Ibarra Dep. 131:15-132:13.)  Iverson also claims that he discussed the need for Ibarra to be unloading at least four cars each day, but Ibarra testified that Iverson did not raise this issue.  (Kuboushek Aff., Ex. H, pt.1 at 28; Ibarra Dep. 125:6-14.)

On January 6, 2012, Iverson, Baker, and Folkedahl met with Wesley Hompe and Larry Heinen who had taken over as co-general managers of WMU after Gomm was placed on administrative leave.  (Folkedahl Dep. 35:24-36:7.)  At the meeting Hompe testified that he and Heinen "asked as many details" as they could to get a "clear picture" of why Ibarra should be terminated.  (Kuboushek Aff., Ex. F (Dep. of Wesley Hompe ("Hompe Dep.") 34:3-12).)  At the meeting, Hompe testified that the main concern about Ibarra's performance he heard expressed was that he was not "working as fast as they expected."  (Hompe Dep. 35:1-15; *see also* Baker Dep. 27:21-28:7 (testifying that his "main concern" with Ibarra's performance was "[t]hey couldn't unload enough coal cars in a day").)  At the meeting both Iverson and Baker recommended that Ibarra be terminated and Folkedahl largely deferred to their recommendation.  (Hompe Dep. 37:7-16.)  Hompe understood that the issues with Ibarra's performance had not previously been communicated to Ibarra because until recently Gomm had been WMU's general manager and Iverson and Baker felt "they would get some sort of retribution from Mr. Gomm" if they criticized Ibarra's performance.  (*Id.* 38:24-40:8.)  At the meeting,

Hompe and Heinen concluded that termination was appropriate.  (*Id.* 38:17-20; Folkedahl Dep. 36:3-16.)

That same day Folkedahl called Ibarra to his office.  (Folkedahl Dep. 58:17-20, 59:23-60:3.)  Both Baker and Iverson were also present.  (*Id.* 59:23-60:3.)  Folkedahl informed Ibarra that he was being let go because his performance did not meet expectations.  (*Id.* 60:4-14.)  Folkedahl believed Ibarra's termination was unfair, as Folkedahl had not been given the opportunity to review his performance for an adequate period of time.  (*Id.* 80:1-15.)

## IV.    OTHER TERMINATIONS

During his tenure at WMU Ibarra was the only employee of Hispanic descent and one of three Mormon employees.  (Nash Dep. 54:2-20.)  After Ibarra's termination, the two other Mormon employees – Gomm and Alais Peterson – were also terminated for "failure to perform job duties."  (Andersson-Stern Aff., Ex. 4 at 5.)  These three employees were the only employees terminated from WMU since 2008.  (*Id.*)  With respect to the coal handler position specifically, in 2004 or 2005 an individual was terminated from that position for failure to obtain either the commercial driver's license or the special engineer's license.  (Iverson Dep. 31:3-10; Baker Dep. 36:25-37:14.)

Defendants contend that there was a general concern among WMU employees regarding Gomm's hiring practices.  Hompe, the current general manager of WMU, testified that his impression of Gomm's hiring practices was that "Gomm was more interested in hiring people he knew well than people with skills and qualifications."

(Hompe Dep. 51:11-15, 60:4-13.)  Other WMU employees indicated that, in addition to Ibarra, they were concerned about Gomm's hiring of Jon Folkedahl as the power plant supervisor, Adam Braegelman as a line technician and Alais Peterson as an office manager.  (Andersson-Stern Aff., Ex. 1 at 21, 28-29, 33.)  Nash also testified that WMU employees made sarcastic comments about Gomm continuing to hire Mormons.  (Nash Dep. 47:23-48:5.)  In response to the question "Do you know if there was a concern overall at [WMU] that [Gomm] was going to continue to hire Mormons?" Nash stated "Certainly that would come up.  I mean, you know, in some sort of sarcastic way." (*Id.*)

Rosen is still in the position of coal handler at WMU, although concerns about his level of performance remain.  (Baker Dep. 20:13-16, 21:6-11.)  Folkedahl and Iverson had a conversation with Rosen to address issues with his productivity – particularly his slowness in unloading coal cars.  (Iverson Dep. 23:25-24:22.)  Other than the conversation, no disciplinary action has been taken against Rosen.  (*Id.* 23:25-24:3; Baker Dep. 21:1-5.)  Baker testified that Rosen was not terminated despite his lack of productivity in the position because he had originally been hired as a custodian which is a position with different job requirements and had switched to the position of coal handler after his six-month probationary period expired.  (Baker Dep. 20:17-25.)

## V.    PROCEDURAL HISTORY

On January 13, 2012, Ibarra filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") identifying discrimination because of his national origin (Mexican) and his religion (Mormon) as the basis for his charge.

(Kuboushek Aff., Ex. I.)  Specifically Ibarra claimed that he was "treated differently and less favorably" because he "was required to take the CDL exam on unpaid time as my coworkers were paid to take the exam" and he "was terminated without warning on January 6, 2012, a week after I was told my performance was acceptable."  (*Id.*, Ex. I at 2.)  Ibarra received notice of his right to sue on October 11, 2012.  (*Id.*, Ex. L.)  Ibarra filed his complaint with the Court on December 4, 2012, alleging national origin and religious discrimination in violation of Title VII and the MHRA.  (Compl., Dec. 4, 2012, Docket No. 1.)

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.        DISCRIMINATION CLAIMS

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the MHRA makes it unlawful for an employer to "discharge an employee" or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employee's religion or national origin. Minn. Stat. § 363A.08, subd. 2. The Court analyzes an employer's liability under both Title VII and the MHRA using the same legal standards. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc); *Bahr v. Cappella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

### A.        Summary Judgment Standard

In the absence of direct evidence, which Ibarra concedes he does not have, the Court analyzes claims of discrimination under the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 520 (8th Cir. 2010). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Torgerson*, 643 F.3d at 1046. To establish a prima facie case of discrimination on the basis of religion or national original, the plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position (sometimes

articulated as meeting the employer's legitimate expectations); (3) he suffered an adverse employment action; (4) under circumstances permitting an inference that the action was a result of unlawful discrimination." *Anderson*, 606 F.3d at 520.[3]  A "minimal evidentiary showing" satisfies a plaintiff's burden of production with respect to the prima facie case. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005) (internal quotation marks omitted).

After a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to "rebut the prima facie case by articulating one or more legitimate, nondiscriminatory reasons for its decision." *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006); *see also Torgerson*, 643 F.3d at 1046.  "'The ultimate burden then falls on [the plaintiff] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the defendant's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination.'"  *Torgerson*, 643 F.3d at 1046 (alterations and internal quotation marks omitted).  The plaintiff's burden of showing pretext "'merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination.'"  *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  A plaintiff's strong prima facie case coupled with evidence of pretext "may suffice to create a triable question of fact."  *Id.*

---

[3] The fourth element of the test has sometimes been phrased as requiring proof "that similarly situated employees outside the protected class were treated differently."  *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008).  But other Eighth Circuit cases clarify that this is only one of a variety of ways a plaintiff may establish the fourth element of the prima facie case.  *See Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039-40 (8th Cir. 2010).

**B.      Prima Facie Case**

Defendants concede that Ibarra has satisfied the first and third prongs of a prima

facie case – that he is a member of a protected class and suffered an adverse employment

action when he was terminated.  The parties dispute whether Ibarra was qualified for the

position and whether the circumstances permit an inference that his termination was the

result of unlawful discrimination based on either his national origin or religion.

**1.      Qualified for the Position**

"The standard for assessing performance is not that of an ideal employee, but

rather what the employer could legitimately expect."  *Calder v. TCI Cablevision of Mo.,*

*Inc.*, 298 F.3d 723, 729 (8th Cir. 2002) (internal quotation marks omitted).  The Court's

task is to determine whether a genuine issue of material fact exists as to whether Ibarra

was performing his job as coal handler at a level that satisfied WMU's legitimate

expectations.  *See Hindman v. Transkrit Corp.*, 145 F.3d 986, 991 (8th Cir. 1998),

*abrogated on other grounds by Torgerson*, 643 F.3d 1031 (8th Cir. 2011).  But in

assessing whether an employee was qualified or meeting the employer's legitimate

expectations the Court must guard against collapsing the prima facie case inquiry and the

question of whether the non-discriminatory reason given by the employer for terminating

the employee was pretextual.  *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d

940, 944 (8th Cir. 1994).  In other words,

> [t]he prima facie inquiry asks only whether the employee was qualified for
> her job – that is, capable of performing the job.  It is possible – indeed, it is
> common – for an employee to be qualified for a job but not be performing

that job satisfactorily. That may give the employer a reason to fire the employee, but it does not mean that she cannot establish a prima facie case.

*Schaadt v. St. Jude Med. S.C., Inc.*, Civ. No. 05-1167, 2007 WL 978093, at * 5 (D. Minn. Mar. 30, 2007).

Here, Defendants argue that Ibarra was not qualified for the position because the job description "required Ibarra to either have his [commercial driver's license] and special engineer license, or to take the necessary steps to obtain both licenses within the six-month probationary period." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 20, Nov. 1, 2011, Docket No. 17.) It is undisputed that at the time of his termination Ibarra had obtained his commercial driver's license. Therefore Defendants have failed to present evidence that Ibarra was not qualified for the position due to the lack of a commercial driver's license.[4]

The only remaining issue, therefore, is whether Ibarra was not qualified for the coal handler position, or failing to meet WMU's legitimate expectations, because he had

---

[4] Defendants make much of the fact that Ibarra failed the driving portion of his commercial driver's license the first time for failure to properly complete the pre-trip inspection. Defendants have not presented any evidence, however, that Ibarra's initial failure to pass the test somehow disqualified him from the coal handler position, in light of the fact that Ibarra later passed the test. Additionally, Defendants insinuate that Ibarra may not have been qualified because he did not obtain his commercial driver's license until December 2011, five months after he began his employment. According to Defendants' own representations, however, Ibarra was only expected to obtain the commercial driver's license within the first six months of his employment. (*See* Iverson Dep. 31:3-32:4.) Accordingly, the Court will not give any weight to, or draw any negative inferences from, the length of time it took Ibarra to obtain his commercial driver's license, because in order to be qualified for the position, Ibarra was only required to obtain the license within six months.

failed to obtain the special engineer's license at the time of his termination.  The Court

concludes that the record does not support Defendants' contention that the special

engineer's license was a requirement of the coal handler position.   The newspaper

advertisement for the coal handler position lists a special engineer's license, but does not

list it as one of the position's requirements.   The interview questionnaire similarly did not

list the license under the job's requirements, which did include the commercial driver's

license.   Although the questionnaire indicated that as a coal handler Ibarra would "be

asked to obtain a Special Engineers license and to obtain the next license as you gain time

in grade" this provision does not suggest that the license was a requirement of the job, but

rather was something that WMU would later ask Ibarra to acquire.   Furthermore Nash,

Baker, and Folkedahl all testified that coal handlers are not required to have the special

engineer's license.   That the special engineer's license was not a job requirement is

especially supported by the fact that Rosen, the other coal handler during Ibarra's

employment, did not have a special engineer's license and was not asked by WMU to

obtain one.[5]  Therefore, the undisputed facts in the record demonstrate that Ibarra has met

his prima facie burden of showing that a special engineer's license was not a requirement

---

[5] Defendants argue that Rosen's failure to obtain the special engineer's license is not evidence of what the requirements of the coal handler position were because "Rosen was not the standard or typical coal handler – he was not originally hired as a coal handler and was therefore not subject to the same requirements as Ibarra when hired."  (Reply at 4, Dec. 5, 2013, Docket No. 26.)   Whether Rosen was originally hired as a coal handler is irrelevant to the inquiry of whether, as Defendants claim, the special engineer's license was required in order to occupy the position of coal handler at WMU.   That Rosen was able to hold, and continues to hold the position, without obtaining or being required to obtain the special engineer's license, strongly suggests that the license is not a necessary qualification for coal handlers at WMU.

of the coal handler position, and Ibarra's lack of such a license did not render him unqualified for the position.

At most, the record contains evidence that WMU **preferred** its coal handlers to obtain a special engineer's license at some point.  But Defendants have presented no undisputed facts that WMU preferred or required such a license to be obtained by coal handlers prior to the expiration of their six-month probationary period (during which period of time Ibarra was terminated) or that Ibarra was asked to obtain such a license during the period of his employment and refused.  Indeed, Ibarra testified that during his interview Nash told him that if he wished to become a boiler operator he would need to obtain the special engineer's license and the interview questionnaire stated that "[a]s a coal handler you will be asked to obtain a Special Engineers license and to obtain the next license as you gain time in grade."  (Kuboushek Aff., Ex. A, pt. 2. at 21.) Furthermore, Nash testified that WMU preferred coal handlers to get a special engineer's license **at some point** so they could advance at the power plant.  This evidence does not establish, as Defendants contend, that the preference or requirement was for coal handlers to obtain a special engineer's license prior to the expiration of their probation period. Therefore, a jury could reasonably find that Ibarra was performing his job up to the expectations of his employer by obtaining his commercial driver's license within the six-month probationary period and indicating a willingness to obtain his special engineer's license during that time period. *See Mudrich v. Wal-Mart Stores, Inc.*, 955 F. Supp. 2d 1001, 1008 (D. Minn. 2013) ("But in light of the circumstances Mudrich describes, particularly the mixed messages he received from supervisory figures, the Court finds

that Mudrich's belief that his performance was satisfactory may have been reasonable and there is a genuine factual dispute regarding whether he was meeting Wal-Mart's expectations."); *Schaadt*, 2007 WL 978093 at *5 (finding that plaintiff satisfied her burden of showing she was qualified for the job where "Schaadt was given certain objectives that she was expected to accomplish during her first 120 days. At the time that she was fired (only two months into her job), she had already exceeded some of her objectives, and she was on her way to meeting others.").[6]

### 2.    Inference of Unlawful Discrimination

A plaintiff can satisfy this part of the prima facie case "in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). Here, the Court finds that Ibarra has shown an inference of discrimination sufficient to satisfy his prima facie case. With respect to religious discrimination, Ibarra has presented evidence that the only other Mormon employees at

---

[6] In their reply brief, Defendants argue for the first time that Ibarra was not meeting WMU's expectations for purposes of establishing his prima facie case because "he required assistance to complete his job duties" as evidenced by the fact that "other Utilities employees were sent out to help unload coal on multiple occasions." (Reply at 3, Dec. 5, 2013, Docket No. 26.) Because this argument was raised for the first time in the reply, the Court need not consider it. *See Redking Foods LLC v. Minn. Assocs.*, Civ. No. 13-0002, 2014 WL 754686, at *4 & nn.4-5 (D. Minn. Feb. 26, 2014). Even if the Court were to consider the argument, it does not alter the conclusion that Ibarra has presented sufficient evidence in support of his prima facie case to survive summary judgment. A genuine issue of material fact remains regarding whether completing job duties without assistance was actually a requirement of the coal handler position, as Rosen also required assistance with unloading coal and remains employed as a coal handler at WMU.

WMU – Gomm and Peterson – were also terminated, and that Ibarra, Gomm, and Peterson were the only employees to be terminated since 2008.  This type of evidence, although not determinative of discrimination, supports Ibarra's claim that his termination was the result of his religion.  *See Veliz v. City of Minneapolis*, Civ. No. 07-2376, 2008 WL 2622966, at *8 (D. Minn. July 2, 2008) (finding evidence "that no minority MPD sergeants have ever been appointed as sergeants on the Strike Force" supported plaintiff's claim that he was denied a position on the Strike Force due to his race and national origin).  Additionally, Nash testified that there was an overall concern at WMU that Gomm was going to continue to hire Mormons and employees at WMU spoke sarcastically about Gomm's hiring of Mormons.  When Gomm left his employment at WMU, although there had been a widespread concern that he hired unqualified employees – including at least two non-Mormons Folkedahl and Breagelman – the only such employees to be terminated were Mormon employees.  The statistical evidence and the animosity toward Gomm's hiring of Mormans are sufficient to satisfy Ibarra's burden at the prima facie stage to show that the circumstances of his termination give rise to an inference of discrimination.

The Court also finds that, viewing the facts in the light most favorable to Ibarra, he has satisfied his prima facie burden of demonstrating that his termination occurred under circumstances giving rise to an inference of discrimination based on national origin.  First, decisionmakers made comments about Ibarra's citizenship status.  In particular, Iverson, who was closely involved in the termination decision, asked Ibarra whether he was an illegal alien.  Defendants argue that citizenship status is not protected under Title

- 25 -

VII and therefore cannot provide evidence that Ibarra's termination was the result of illegal discrimination. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (holding that while "[a]liens are protected from illegal discrimination" under Title VII, "nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage"); *Lixin Liu v. BASF Corp.*, 409 F. App'x 988, 991 (8th Cir. 2011) (per curiam) (rejecting Title VII claim where the plaintiff "conflate[d] national origin and alienage" determining that "[h]is employment status was terminated because of his immigration status, not his Chinese ancestry"). But Ibarra does not contend that his termination was the result of his immigration status. Rather, Ibarra argues that the assumptions WMU made about his citizenship/immigration status are evidence of national origin discrimination. In other words, Ibarra argues that if he was originally from Sweden instead of Mexico no one would have questioned the authenticity of his citizenship documents. *See Espinoza*, 414 U.S. at 92 ("Certainly Tit[le] VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin."); *Stankovic v. Newman*, Civ. No. 12-399, 2013 WL 6842530, at *3 (D. Conn. Dec. 27, 2013) ("An employer is permitted to consider citizenship in making employment decisions as long as citizenship is not a proxy for national origin.").

The circumstances of Ibarra's hiring also support an inference of discrimination. Nash testified that Ibarra was hired against the wishes of Nash, Iverson, and Baker due to Gomm's insistence. In particular, Nash testified that Gomm explained he wanted to hire

Ibarra because "he was receiving pressure to hire minorities." (Nash Dep. 26:8-12.)[7] Almost immediately after Gomm left WMU, Iverson and Baker participated in the decision to terminate Ibarra. Because Ibarra had been hired over the objections of Iverson and Baker, in part because of his national origin, a reasonable jury could infer discrimination from the fact that Ibarra's termination occurred almost immediately after the individual that espoused the need to hire a minority was no longer at the company.

Finally, Ibarra has pointed to several examples of differential treatment during his employment that support his claims for discrimination based upon both religion and national origin. Ibarra testified that he was told he could only take PDOs for personal use, although company policy was to allow PDO use for death in the family, personal or family illnesses, or other emergencies.[8] Ibarra also presented evidence that he was told to

---

[7] Defendants argue generally that Gomm's "alleged concerns . . . regarding the hiring practices at the Utilities" are inadmissible hearsay and that a later investigation revealed that Gomm's concerns were unfounded. (Reply at 5.) But Nash could provide admissible testimony about why Ibarra was ultimately hired. Whether there was, in fact, a problem with hiring too few minorities at WMU is beside the point. What is relevant is the state of mind of the decisionmakers that hired Ibarra at Gomm's request and participated in his termination. *See United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) ("[A] statement offered to show its effect on the listener is not hearsay." (alteration in original) (internal quotation marks omitted)).

[8] Ibarra also testified that he was the only employee required to take the written portion of his commercial driver's license exam on his own time rather than during his scheduled work hours. But Ibarra has presented no evidence that other similarly situated employees, i.e. employees that were hired for a position requiring a commercial driver's license that had not yet completed the written portion of the test, were allowed to take that test on company time. Accordingly, based on the record no reasonable jury could conclude that Ibarra received different treatment regarding the written portion of his commercial driver's license exam than other non-Mexican, non-Mormon employees. Additionally, the Court has not relied upon the silo incident to provide evidence of disparate treatment because Rosen – who is not from Mexico and is not Hispanic – was also sent into the silo that had not been ventilated prior to the cleaning. Ibarra also testified that Rosen was similarly unaware of how the oxygen monitoring device worked.

use the pounding plate – a piece of equipment that made the coal handling job easier – for no more than five to ten seconds, although he had observed other workers using the pounding plate for longer than five to ten seconds without being reprimanded.[9]   These incidents could also support an inference that Ibarra's termination was due to discrimination.[10]   Accordingly, the Court concludes that under the prima facie test, which "was never intended to be rigid, mechanized, or ritualistic," *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006), Ibarra has presented sufficient evidence that his termination occurred under circumstances which would permit a reasonable jury to infer that his termination was the result of illegal discrimination on the basis of religion and national origin.

---

[9] Defendants argue that the pounding plate incident cannot be considered at summary judgment because the fact that other employees were allowed to use the pounding plate for longer than five to ten seconds is inadmissible hearsay.  But Ibarra testified that he **observed** other employees using the pounding plate for longer than five to ten seconds without being subject to reprimand, and the hearsay rules are therefore inapplicable.  Furthermore, Defendants argue that they later discontinued use of the pounding plate altogether due to noise concerns, and therefore the reprimand that Ibarra not use the pounding plate for more than five to ten seconds was warranted.  This argument is irrelevant, however, to the question of whether Ibarra was treated differently than other, similarly situated employees at the time he was told to limit his use of the pounding plate.

[10] Defendants argue that the pounding plate and silo incident are not "actionable" because Ibarra failed to exhaust his administrative remedies with respect to these incidents by failing to identify them in his EEOC charge.  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 22.)  But Ibarra does not bring claims based on these incidents.  Instead, he merely uses the incidents as evidence that his termination – a claim he clearly raised in his EEOC charge – was the result of illegal discrimination.   "The object of the exhaustion requirement is the alleged unlawful employment practice."  *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) (internal quotation marks omitted).  The alleged unlawful employment practice here is Ibarra's termination.  The pounding plate and silo incidents, like comments made by Ibarra's supervisors and statistics regarding hiring, are offered by Ibarra in support of that allegation and therefore need not have been exhausted.

### C.    Legitimate Nondiscriminatory Reasons

At this stage of the *McDonnell-Douglas* test, the employer must merely "articulate[] lawful reasons for the action; that is, . . . produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 256-57 (holding that "the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons" (alteration and internal quotation marks omitted)).  The Court is required to accept an employer's explanation "regardless of its persuasiveness." *Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 150 (8th Cir. 1997).  Defendants' articulated reason for firing Ibarra is that "Ibarra simply was not productive as a coal handler, he was unable to unload as much coal as expected.  Further, Ibarra irregularly performed other job duties, including greasing elevators and conveyors."  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 20.)  This explanation is sufficient to shift the burden back to Ibarra to show that Defendants' proffered explanation is pretextual.  *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1047 (8th Cir. 2003) (finding that the employer had satisfied the second step of *McDonnell Douglas* by "alleging poor performance as the legitimate, non-discriminatory basis for Hannoon's termination").

### D.    Pretext

While a court may not second guess an employer's valid, nondiscriminatory employment decisions, it still must analyze whether the employer's proffered reasons for

the adverse employment action are a pretext for intentional discrimination.  *See Moschetti v. Chicago, Cent. & Pac. R.R. Co.*, 119 F.3d 707, 710 (8th Cir. 1997).  A pretext inquiry "is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct."  *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (internal quotation marks omitted).  A plaintiff may demonstrate a material question of fact regarding pretext by showing "that the employer's explanation is unworthy of credence because it has no basis in fact" or "by persuading the court that a prohibited reason more likely motivated the employer."  *Torgerson*, 643 F.3d at 1047 (alterations and internal quotation marks omitted).  A plaintiff may also establish pretext "by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp. Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  The question at this stage is whether Ibarra has produced evidence creating a genuine issue of material fact in support of his claim that WMU's stated reason for his termination was pretextual and that WMU intentionally discriminated against him because of his national origin and religion in violation of Title VII and the MHRA.  *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (stating that the plaintiff must point to "enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions" (internal quotation marks omitted)).  "As a general proposition, it is true that a plaintiff who makes a prima facie case and who presents evidence which, if believed, would discredit the employer's

asserted justification has a right to go to the trier of fact." *Lowe v. J.B. Hunt Transp.*, 963 F.2d 173, 174 (8th Cir. 1992).

The Court concludes that a material issue of fact remains as to whether Defendants' stated reason for Ibarra's termination was pretext. Ibarra has produced evidence that, if believed, would permit a jury to conclude that Defendants' stated reason has no basis in fact. Hompe and Baker both testified that at the meeting about Ibarra's performance prior to his termination the primary concern raised about Ibarra's performance was that Ibarra was not working as fast as expected and did not unload sufficient coal cars each day. In Defendants' brief they also argue that Ibarra failed to perform the task of greasing the elevator each day. But the facts in the record do not support these reasons for termination. The facts show that during Ibarra's tenure the average number of coal cars unloaded was actually **greater** than the average number unloaded both before his employment began and after he was terminated. Defendants proffered no evidence that they measured Ibarra's speed as a coal handler or investigated his speed in comparison to other handlers. Indeed Folkedahl specifically testified that he thought Ibarra's termination was unfair because he had been given inadequate time to assess Ibarra's performance, suggesting that Defendants stated reason for termination – that Ibarra was not unloading coal fast enough – is pretext. *See EEOC v. Minn. Beef Indus., Inc.*, Civ. No. 02-810, 2003 WL 22956445, at *4 (D. Minn. Dec. 11, 2003) (finding summary judgment on pretext inappropriate where "[p]laintiffs have cast sufficient doubt upon the credibility of defendant's proffered justifications for the disparities in pay" by demonstrating that although the employer claimed the male

employee was paid more because he was better qualified, the employer admitted that he had not known what the previous male employee's qualifications and experiences were when deciding upon the salary differential).   Additionally, Ibarra's testimony established that the elevators were greased each day, although he and Rosen took turns performing the task.   Defendants have presented no evidence that the elevators were to be greased twice each day – once by each coal handler.   Accordingly, the facts do not support Defendants' contention that Ibarra failed to ensure the elevators were greased each day. Because a reasonable jury could find that Defendants' stated reason for termination are not based in fact, coupled with the prima facie case, a reasonable jury could also find that discriminatory animus toward Ibarra's religion or national origin more likely motivated the decision.[11]

Furthermore, Ibarra has demonstrated that Rosen – although not in a probationary period – performed poorly in exactly the same ways as Ibarra, and yet was not terminated.[12]   Baker and Iverson both testified that Rosen was also to blame for the

---

[11] At oral argument Defendants emphasized that the incident in which Ibarra sat on a berm while other employees unloaded the coal was the reason for termination.  But this was not the reason for termination provided by Hompe – that Ibarra could not unload enough coal cars each day.   At most this new emphasis on the single incident in which Ibarra sat on a berm demonstrates that Defendants are shifting their explanation for his termination – further evidence of pretext.  *See Lake*, 596 F.3d at 874.

[12] Defendants argue that the probation period allowed them to fire Ibarra for any reason or no reason at all during the first six months of his employment.  But here, Defendants do not contend they fired Ibarra for no reason at all.  They specifically fired him because they claimed he was failing to perform the coal handler job adequately by working too slowly.  This rationale for firing makes a comparison with Rosen appropriate because Ibarra's status as being in a probationary period was not Defendants' stated reason for his termination.  In other words, with

(Footnote continued on next page.)

allegedly slow coal car unloading, and if Ibarra's testimony is to be believed, also neglected to grease the elevators each day.  The fact that Rosen was non-Mormon and non-Mexican, engaged in the same alleged conduct, and was not terminated provides further support that Defendants' stated reason for termination – that Ibarra was not performing the job up to their expectations of productivity – is pretext.  Accordingly, the Court finds that Defendants are not entitled to summary judgment on Ibarra's claims, as a reasonable jury could conclude that Ibarra was terminated because of his national origin and religion, and will deny their motion.

   This case will be placed on the Court's next available trial calendar.


## ORDER

   Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 16] is **DENIED**.


DATED:  July 11, 2014                          ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                               United States District Judge


_____
(Footnote continued.)

respect to the reason for Ibarra's termination – that he was unable to perform the job of coal handler – the two are similarly situated because Rosen was also in the position of coal handler.